# N. Y. SUPERIOR COURT.

In the Matter of the Application of ANNIE T. GLEESE for a writ of peremptory *mandamus* against HENRY C. LICH- FIELD, principal of the male department of grammar school No. 13, in the city of New York, and PATRICK H. HORGAN, GEORGE H. BEYER, DANIEL J. MOORE, HIRAM MERRITT and HENRY MAURER, school trustees of the Seventeenth ward of the city of New York.

*New York (city of) — Public school teachers — How and by whom may be removed — What is a removal — Mandamus the proper remedy where teacher is improperly removed.*

A teacher in a public school in New York city cannot be removed by the trustees of the ward in which such school is situated, except by the approval in writing of a majority of the inspectors of the district, and the approval on appeal of the board of education; and a transfer involving loss of rank and pay is a removal from the position occupied within the meaning of the statute.

A teacher so attempted to be removed has a remedy by *mandamus* to compel the principal of the school and the trustees of the ward, respectively, the former to place such teacher's name upon the monthly pay rolls, and the latter to certify said pay rolls to the inspectors of the district.

*Special Term, May,* 1884.

*Edward M. Shepard,* for relator.

*James J. Thompson,* for respondents.

FREEDMAN, J. — This is an application for a writ of peremptory *mandamus* commanding and requiring Henry C. Litchfield, as principal of the male department of grammar school No. 13, in the city of New York, to prepare monthly pay rolls for the months of February and March, 1884, in such a way as to describe therein the relator as fourth assistant teacher in the primary department of grammer school No. 13, and entitled as such to a salary at the annual rate of $690, and

at the monthly rate of fifty-seven dollars and fifty-one cents, and commanding and requiring the other respondents, as trustees of the Seventeenth ward, in which the said school is situated, or a majority of them, to certify the said monthly pay rolls, and to deliver the same, when certified, to the inspectors of the common schools for the inspection district, including the Seventeenth ward.

Between January, 1866, and December, 1873, the relator had held different positions as assistant teacher of a lower grade than fourth assistant in the primary department of said school. In December, 1873, she was duly appointed by the trustees of the Seventeenth ward to the position of fourth assistant, and, except for about three terms during which she held the position of third assistant, she continued to hold the position of fourth assistant until February 1, 1884. She also continued to hold the last named position since the day last referred to, unless the respondents have established that she was legally removed therefrom.

On the 10th of January, 1884, the school trustees of the seventeenth ward, at a meeting held by them, passed the following resolution, viz. :

"*Resolved*, That for insubordination and disrespect to a trustee, Anna T. Gleese, fourth assistant P. D. No. 13, be transferred to the position of tenth assistant in said school, to take effect February 1, 1884."

The resolution was never approved, in writing or otherwise, by a majority of the inspectors of the district or by any of the said inspectors. The insubordination and disrespect imputed to the relator by the resolution were alleged to have been shown by her principally to Patrick H. Horgan, one of the trustees, in a conversation between her and the trustees Horgan and Moore, in the course of which she was charged with having corporally punished a child in the class taught by her.

From the action of the board of trustees, culminating in the resolution referred to, the relator, on the 19th of January,

1884, appealed to the board of education of the city of New York, whereupon, on the 23d of January, 1884, the trustees caused a formal charge to be made to the board of education against the relator for an alleged violation by her of the by-laws of the last mentioned board in relation to the infliction of corporal punishment.

The charge was duly investigated by the board of education, and, the trustees failing to substantiate it by proof, the complaint against the relator was, on the 6th of February, 1884, dismissed.

The board of education then took up the appeal of the relator from the action of the trustees transferring her to the position of tenth assistant; and, after an examination of the facts relating to the subject-matter thereof, sustained the appeal, and by resolution of March 26, 1884, directed the trustees to reinstate her in the position of fourth assistant, and that such reinstatement should be dated from February 1, 1884.

This resolution was duly transmitted to the trustees, but they refused, and still refuse, with one exception, to comply with it. They did, however, of their own motion, and as early as February 29, 1884, order a reinstatement by the passage of the following resolution, viz.:

"*Resolved*, That Annie T. Gleese be reinstated to the position of fourth assistant of P. D. No. 13 from which she was removed at a meeting held January 10, 1884, to take effect on May 1, 1884."

The proceeding now taken by the relator for a *mandamus* is taken with the sanction and approval of the board of education, whose authority in the premises the trustees, with one exception, refuse to recognize.

Upon the facts as they are made to appear, and as to which there is no dispute, it can hardly be doubted that the trustees undertook to punish the relator for having inflicted, as they claim, corporal punishment upon a child. If that offense had been committed, the commission of it would have been a vio-

lation of a by-law of the board of education (*Manual of the Board of Education* [*edition of* 1884], *sec.* 44, *p.* 120). Upon the report of such a violation the board of education conducts or directs the investigation, and if the charge be sustained, itself directs the punishment (*Sec.* 44, *subd.* 7).

At the outset of this case, therefore, we have the relator charged with a violation of a by-law of the board of education. We have the relator's innocence of the charge conclusively established by the board of education, the only tribunal which could try the charge. And we then have the ward trustees punishing the relator for an offense of which she was conclusively shown to be innocent, and for which, even if she had been guilty, the ward trustees had no power to punish her.

The respondents, with a single exception, which will be hereinafter referred to, and to which, for that reason and for the sake of convenience, no further reference will be made at present, contend, however that the board of trustees of the ward has by statute the sole and exclusive right of appointment of assistant teachers; that the relator was and is an employe of the said board; that the said board has full and unlimited power to transfer assistant teachers from one position to another, and had full and unlimited power to transfer the relator from the position of fourth assistant to the position of tenth assistant; and that the board of education could not, and cannot, by claiming and assuming appellate jurisdiction in such a matter, confer upon itself such jurisdiction.

This contention does not affect the relator alone, but is of the gravest importance to the whole public school system, and especially to the 3,000 teachers employed in the schools of this city, and its determination will be the first judicial determination of the question whether or not the law affords, as it has been so far supposed to afford, protection in position and salary to every teacher who faithfully and regularly performs his or her duties. In view of this great importance of the controversy, I gave to the points involved the most

careful consideration, and the conclusions reached will necessarily have to be stated somewhat at length.

At the outset valuable assistance will be derived by a clear perception of the relative powers of the board of education and of the board of trustees of a ward of the city of New York.

In *Donovan* agt. *The Board of Education* (44 *N. Y. Supr. Ct. R.* [12 *J. & Sp.*] 53), I gave an account of the statutes in this state relating to public education in the city of New York, from the passage of the act of 1805 to the year 1873, and of the history of the board of education of the said city, and showed that the said board is a governmental agency created by the sovereign power of the state for the discharge of such powers and duties as were conferred upon it by law, and that in creating it the policy of the state was to instruct and enlighten equally the minds of all children needing education, irrespective of the nationality, religion or pecuniary condition of their parents, and by these means to gradually transform the heterogeneous and uncongenial element of the cosmopolitan city of New York into an intelligent, virtuous, harmonious and happy people.

Since that decision, chapter 410 of the Laws of 1882, commonly known as the New York city consolidation act of 1882, was passed, by which all the special and local laws affecting public interests in the city of New York were consolidated in one act. Such consolidation embraced, among other things, a consolidation of all the statutes relating to public education in the city of New York, and in so far as in such consolidation phraseology is employed which is more comprehensive than the language of a statute superseded thereby, it operates as a new and direct grant of power· It is, therefore, not necessary to refer to the preceding statutes.

Now, section 1022 of the consolidation act provides that the board of education shall "have full control of the public schools and the public school system of the city, subject only to the general statutes of the state upon education." The

same ample grant of power was repeated in section 1026.
The same language is first found in section 4 of chapter 112
of Laws 1873.

In addition to this general grant of power the board of
education is further specially authorized, among other things,
and it is made its duty :

1. To appoint the city superintendent and the assistant
superintendents of schools (*Sec.* 1027, *subd.* 2).

2. To appoint the principals and vice principals of schools
upon the written nomination of a majority of trustees of the
ward (*Sec.* 1027, *subd.* 3).

3. To discontinue any school (*Sec.* 1027, *subd.* 4, 13).

4. To draw the moneys for the purpose of public education
(*Sec.* 1027, *subd.* 5).

5. To visit and examine the schools (*Sec.* 1027, *subd.* 6).

6. To make general regulations to secure economy and
accountability in the expenditure of school moneys (*Sec.* 1027,
*subd.* 7).

7. To remove any school officer for being interested in fur-
nishing supplies or materials, or in payments therefor, or for
immoral or disgraceful conduct in any matter connected with
his official duties, or which tends to discredit his office, or the
school system (*Sec.* 1027, *subd.* 11).

8. To take any school entirely out of the hands of the
ward trustees, and to take charge of such school, and manage
the same where the trustees neglect the school (*Sec.* 1027, *subd.*
12).

9. To apportion the school moneys to the schools entitled
to participate therein (*Sec.* 1028, *subd.* 1).

10. To provide, by general rules and regulations, for the
proper classification of studies, scholars and salaries in such
manner that, as near as practicable, the system of instruction
pursued in the common schools, and the salaries paid to
teachers, shall be uniform throughout the city (*Sec.* 1028,
*subd.* 6).

11. To have the care and control of the title of all school

property, real and personal, though such title is vested in the mayor, aldermen and commonalty of the city of New York, and to make all necessary appropriations, exceeding $200 in amount, for the purchase of school sites, and for the erection, fitting up, or repairing of buildings (*Sec.* 1029); and

12. To receive from the school inspectors and school trustees annual reports as to the condition, efficiency and wants of the schools and school premises (*Secs.* 1034 *and* 1035, *subd.* 5).

To make more complete the control thus given to the board of education, the latter was further clothed with the power to appoint the trustees of the several wards to fill vacancies, and in proper cases to remove them (*Secs.* 1025, 1027, *subd.* 11), and to prescribe general rules and regulations and limitations under which the trustees of the several wards are to conduct and manage their respective schools (*Sec.* 1035, *subd.* 3).

The powers and duties of the trustees of the several wards on the other hand, were extended by section 1035 :

1. To the safe keeping of all premises and other property used for, or belonging to, the schools in their respective wards.

2. To the appointment of teachers other than principals and vice principals and of janitors.

3. To conduct and manage the schools, furnish needful supplies and make needful repairs ; but all this under such general rules and regulations, and subject to such limitations as the board of education may prescribe.

4. To keep books of account and records.

5. To make a report to the board of education.

6. To hold as a corporation personal property vested in, or transferred to, them for school purposes.

7. To render accounts to their successors ; and

8. To appoint times of meeting and declare vacant the office of one of their number who refuses to attend any three successive stated meetings. They may also nominate principals and vice principals, but the nomination may be utterly disregarded by the board of education (*Sec.* 1827, *subd.* 3). Their consent is necessary to a discontinuance of any school, unless

Matter of Gleese.

two-thirds of the board of education vote the discontinuance. They may apply to the latter board for a new school, and if their application be refused, they may appeal to the state superintendent (*Sec.* 1027, *subd.* 13). They may organize new schools when they are duly authorized, and may procure, or hire, or erect a school-house as they may be authorized by the board of education, and in fitting up a school-house may incur expenses not exceeding the amount of $200 without being specially authorized (*Sec.* 1037). They may remove teachers other than principals and vice principals and janitors, provided the removal be approved by the inspectors, subject to the decision of the board of education upon appeal (*sec.* 1038); and, finally, they must certify all expenses incurred for the schools (*Sec.* 1036).

It is impossible to consider this division of powers and duties and the general scope of this carefully drawn statute, without reaching a conviction that the legislature believed that public policy required in the city of New York a harmonious and effective school system, and that in so vast and cosmopolitan a community, with such varieties of interests, feelings and prejudices, it was essential that the controlling authority should represent the entire city, and not any particular ward or district. To accomplish this result the board of education was invested with full control of the public schools and the public school system of the city, subject only to the general statutes of the state upon education, and for these purposes it was constituted a corporation (*Sec.* 1027). At the same time certain special powers were conferred upon the boards of trustees of the several wards as inferior, though to a certain extent independent bodies, but such powers were well defined and clearly restricted. The result is, that the power of the board of education in educational matters is general, except where it is distinctly restricted, and that the power of the trustees exist only where it is granted in terms. Authority is to be presumed in the board of education, but on the part of the boards of trustees of the several wards it

Matter of Gleese.

must be pointed out either in the statute or in the rules and regulations of the board of education. If, therefore, in any particular matter relating to the administration of the public school system, it appears that the board of education has done a specific thing or given a specific direction within the reasonable limits of such administration, the burden is upon any one who claims the act or direction to be invalid, to find in the general statutes of the state upon education, or in the specific statute organizing the board of education, a plain and express provision limiting the power of the board of education to do the act or give the direction. The case of *The People ex rel. McHugh* agt. *Board of Education* (18 *Abb.*, 165), upon which the respondents largely rely, was decided before there was made, by the act of 1873, this general grant of power, subject "only to the general statutes of the state upon education." It arose under chapter 386 of the Laws of 1851, by which absolute power of appointment and removal, free from any appeal, subject only to such general rules and regulations as the board of education might adopt, had been conferred upon the trustees.

Having thus considered the general scope of the law and the division of powers and duties made by it, it now becomes essential to examine somewhat more in detail the questions relating directly to the appointment, removal and transfer of teachers other than principals and vice principals. Such teachers, it has already been shown, are to be appointed by the boards of trustees of the several wards (*Sec.* 1035). This is a mere naked power to appoint. In respect to removals, it is provided by section 1038 as follows:

"The board of trustees for the ward, by the vote of the majority of the whole number of trustees in office, may remove teachers employed therein, other than principals and vice principals, and may also remove janitors, provided the removal is approved in writing by a majority of the inspectors for the district, and provided further, that any teacher so removed shall have a right to appeal to the board of educa-

tion, under such rules as it.may prescribe, and the said board shall have power, after hearing the answer of the trustees, to reinstate the teacher."

But as to transfers the statute is·wholly silent. Any transfer amounting to a removal is, of course, covered by the statute. As. to all other transfers falling short of that, the board of education may take the initiative. In either class of cases the board of education may make general rules and regulations to be observed by the trustees, and impose limitations upon their action, with this difference, however, that in the case of a transfer amounting to a removal the rules and regulations and limitations must not be inconsistent with the statutory provisions, and that in every other case of transfer they may take any form which, to the board of education, seems proper.

In the exercise of this power the board of education enacted the following by-law, viz.: " Section 34. Upon the dismissal or application for dismissal of a teacher, or upon any transfer of a teacher from one school or department to another, or upon the change in schedule position in any school of a teacher, the board of trustees shall file with the clerk of the board a copy of the resolution under which it acted, and notify the teacher, in writing, of the cause of its. action. The teacher shall have the right to appeal to this board within ten days after the service of the notice aforesaid, and said appeal shall be immediately referred to the committee on teachers to examine into the facts and circumstances of the case, and report to this board, and the clerk of this board shall at once forward a copy of the appeal to the board of school trustees whose action is appealed from. Pending the consideration of such appeal·no salary shall be paid to any teacher acting in the place of the appellant without the consent of this board first being obtained, nor shall any appointment to the position occupied by the appellant be acknowledged without the consent herein referred to being first had. If this board shall decide that there was no good cause for the action of the

trustees appealed from, then the teacher shall be restored to the position and salary he or she had previous to the action of the trustees and payment for the intermediate time."

The validity and binding force of this by-law, if it were applicable to the case at bar, could not be questioned, and in such case it would be decisive of the main question involved. But it does not apply, because it was shown to have been enacted since the present contention arose. It cannot have any retroactive effect. The by-laws, as they stood at the time of the origin of the difficulty, referred simply to dismissals, and not to transfers or changes in schedule position. Nor do I deem it worth while to stop to consider whether there is or is not a difference, and if there is, what the nature of the difference is, between the case of a removal contemplated by the statute and the case of a dismissal spoken of in the by-laws as they formerly stood.

The question to be determined narrows itself, therefore, down to this : Was the transfer of the relator equivalent to a removal within the meaning of the statute ? Upon this point a clear understanding of the precise position which the relator occupied as fourth assistant, becomes of the utmost importance.

The by-laws of the board of education then in force directed the boards of trustees of the several wards, at the first of each year, to prepare a schedule of salaries to be paid to the assistant teachers, the schedule to exhibit the distribution of the total amount of money to which each school was entitled, and the positions to be numbered in regular order upon said schedule. This schedule, it was further provided, should form the rule for the payment of assistant teachers in the several wards for the year. In pursuance of this direction the respondent, on January 1, 1884, established twenty-three positions of assistants, and designated them numerically as first assistant, second assistant, and so on. The official pay-roll, prepared under the direction of the respondents for January, 1884, distinguish between the same positions and described the relator as fourth assistant. The salary of the first assistant was fixed at

Matter of Gleese.            .

$903 a year; that of the fourth assistant at $690; that of the tenth assistant at $586; and that of the twenty-third assistant at $500. All this is very clear proof that there are various positions among assistant teachers, and that one of those positions is that of fourth assistant. The most characteristic distinction between the different positions is this difference of salaries, and this subject has been most carefully regulated. In addition to the provisions of the by-laws of the board of education already noticed, section 35, subdivision 6, directs the trustees to grade the salaries of assistant teachers so that the difference between two successive grades shall not exceed $100. Section 33, subdivision 9, forbids the pay to a substitute teacher of a salary more than three-fourths the regular salary of the position in which the substitute teacher is employed. Moreover, the duties of the assistant teachers vary with the grades which they teach (*Sec.* 146).

There was, therefore, the position of "fourth assistant" fixed by the respondents' own designation and description, shown by the official pay-roll and other official papers, and distinguished by a particular salary and by particular duties. This is obviously, therefore, a position recognized in the educational system and to which its occupant had a particular claim.

Now, by their resolution of January 10, 1884, the trustees of the Seventeenth ward transferred the relator to "the position of tenth assistant," and in their resolution of February 29, 1884, they undertook to reinstate her "to the position of fourth assistant * * * from which she was removed * * .*" This transfer, under the circumstances stated, invoking, as it did, not only the loss of the right to discharge particular duties, but also loss of rank and of pay, was, in my judgment, an attempt to remove the relator from the position of fourth assistant within the meaning of the law. The statute is not to be confined to a removal from office, which is entitled to an entire and absolute dismissal from the public school service. If such had been the intention of the legisla-

ture, it is but fair to assume that it would have said so in unambiguous language. Instead of that, the statute speaks of removals in general terms. Now, to remove is defined by lexicographers to mean to change place, or to make a change in place in any manner. But for the purposes of this case it is not necessary to go to that length. While, therefore, I do not hold that every transfer of a teacher is, *per se*, a removal within the statute, I am clearly of the opinion that a transfer accompanied by the assignment of inferior duties and by loss of rank and pay, and therefore involving degradation, is, in substance, and therefore amounts to a removal from the position occupied within the meaning of the statute. The trustees, in this case, themselves regarded the transfer as a removal, for in their resolution of February 29, 1884, they speak of reinstating the relator " to the position of fourth assistant, from which she was removed," &c.

The opinion expressed by me is in accord with the views expressed by the learned counsel to the corporation of the city of New York in his communication to the board of education, reported in the minutes of said board of July 3, 1878, and the action of the board of education thereunder since that time.

Nor is there any authority to the contrary. *Reilly* agt. *The Mayor* (16 *J. & Sp.*, 274), *O'Brien* agt. *The Mayor* (28 *Hun*, 250), and *Monroe* agt. *The Mayor* (28 *Hun*, 258), were cases that arose under the statutes relating to the fire department. In each of these cases there was an acquiescence in the transfer and a voluntary acceptance of the new appointment, and the decision proceeded upon this ground. Besides, the statutes were entirely different from the one now under consideration. In the case of Monroe, it is true Mr. justice DAVIS, in the course of his reasoning, added that " the plaintiff was not removed from his position as a member of the fire department. He was simply transferred from one post to another." But this observation, if it were not *obiter*, was expressly stated by the judge to be based upon the charter

provision, " that the number and duties of the subordinates in every department, with their respective salaries, shall be such as the heads of the respective departments' shall designate and approve." The fire commissioner, Mr. justice DAVIS therefore said, had power to fix and alter, at pleasure, the salary of any employe.

This provision has no application whatever to school teachers or to the trustees of the schools of the several wards, and from what has already been said, it is too clear for argument that it cannot have any application to a school board with such limited powers as are possessed by the trustees of the schools of the several wards.

Nor was there any acquiescence by the relator in the transfer. She did not accept the position of tenth assistant so as to be estopped from asserting her rights. On the contrary, she immediately appealed from the action of the trustees to the board of education, and refrained only from performing the duties of fourth assistant, as far as by the action of her superiors, she was compelled to do so. That in the meantime she did perform the duties of tenth assistant cannot be urged in bar of her claim. She was neither paid as such, nor did she receive, so far, any pay whatever for the period in controversy.

The transfer of the relator, under the circumstances stated, having been shown to amount to an attempt to remove her within the meaning of section 1038 of the statute from the position she held as fourth assistant, the removal, in order to become effective, required, in the first instance, the approval in writing of a majority of the inspectors of the district, and in the second place the approval, on appeal, of the board of education. Neither has been had or obtained. On the contrary, the board of education, upon a hearing of her appeal, sustained her claim and directed her reinstatement, and that such reinstatement be dated from the day the transfer was made to take effect under the resolution of the trustees. She was, therefore, never removed from the position of fourth

assistatant or deprived of any right or emolument attaching to said position.

There is still another point in favor of the relator. Section 38 of the by-laws of the board of education, in force at the time of the passage by the trustees of the resolution of January 10, 1884, provided, and still provides, as follows, viz.:

"No reduction of salary shall be made in the case of any principal or vice principal, or assistant teacher, whose appeal from the action of the board of trustees shall have been sustained by the board of education, except upon the approval of the last mentioned board; and no reduction shall be made in the salary of any teacher whose removal by a board of trustees has not been approved by the inspectors of a school district, or a majority of them, unless the decision of the latter is overruled by the action of this board."

Under this by-law the claim of the relator would have to be sustained even if her case were treated as involving nothing more than a reduction of salary.

The only remaining question, therefore, is whether the relator has a remedy by *mandamus*.

The *mandamus* is not asked to compel the payment of the money. The respondents have no money in their hands, and it is never their duty to make payment. But there are devolved upon them certain specific ministerial duties, in the performance of which the relator has an interest, and without the performance of which she may be defeated, or at least hindered and delayed, in the enforcement of her rights; for section 1034 of the consolidation act expressly provides that it shall be the duty of the inspectors of common schools, or a majority of them, in their respective districts, to examine in respect to every expense certified as correct by a majority of the trustees of any ward in the district, and to audit every such expense which may be just and reasonable; and that no expense shall be paid unless audited in this manner.

The legal duty of the respondent Litchfield, as principal of the school, to prepare the pay-roll, arises from a by-law of the

board of education, made in the exercise of the powers of said board conferred by statute. The legal duty of the trustees to certify the pay-roll, when prepared, is imposed by section 1036 of the consolidation act. Thus all the respondents are required by law to furnish to or for the relator certain vouchers, without which she either cannot be paid at all, or without which she will be seriously hindered and delayed in obtaining payment of her just claim.

In such a case the rule that *mandamus* will not lie where the relator has a remedy by action is not applicable, but the courts will compel the performance of the legal duty as an indispensable preliminary to any payment. (*The People ex rel. Satterlee* agt. *Board of Police*, 75 *N. Y.*, 38; *The People ex rel. Navarro* agt. *Van Nort*, 64 *Barb.*, 205; *The People ex rel. Navarro* agt. *Green*, 2 *Supr. Ct. R.* [*T. & C.*], 62).

The brief memorandum of BARRETT, J., in *The People ex rel. Harnett* agt. *The Inspectors of Common Schools of the Seventeenth Ward* (44 *How.*, 322) does not conflict with the rule as stated, because in that case the *mandamus* was withheld for the reason that the validity of the relator's appointment was in dispute.

For the reasons stated the relator is entitled to a peremptory *mandamus* against all the respondents as prayed for, with an allowance of fifty dollars costs and her disbursements against all except George H. Beyer. The latter is exempted from the payment of costs because he refrained from opposing the application for a *mandamus* and signified his readiness and willingness to perform his duty in the premises.